# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| JENNIFER ZONA, derivatively on behalf of YUM! BRANDS, INC., | Case No.:   3:13-CV-506-R |
| Plaintiff, | |
| v. | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| DAVID C. NOVAK, JING-SHYH S. SU, MICHAEL J. CAVANAGH, DAVID W. DORMAN, MASSIMO FERRAGAMO, MIRIAN M. GRADDICK-WEIR, J. DAVID GRISSOM, BONNIE G. HILL, JONATHAN S. LINEN, THOMAS C. NELSON, THOMAS M. RYAN, ROBERT D. WALTER, SCOTT O. BERGREN, ROGER G. EATON, JONATHAN D. BLUM, ANNE P. BYERLEIN, and RICHARD T. CARUCCI, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants, | |
| and | |
| YUM! BRANDS, INC., | |
| Nominal Defendant. | |

By and through her undersigned counsel, Plaintiff Jennifer Zona ("Plaintiff") brings this shareholder derivative action on behalf of Yum! Brands, Inc. ("Yum" or the "Company") and against certain officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, insider selling, and aiding and abetting thereof.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which include, without limitation: a) review and analysis of public filings made by Yum and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, postings on Yum's website concerning the Company's public statements; and d) review of other publicly available information concerning Yum and the Individual Defendants.

## I.     INTRODUCTION

1.      Yum describes itself as the world's largest quick service restaurant company based on number of system units, with approximately 39,000 restaurants in more than 125 countries and territories.   The Company develops, operates, franchises and licenses a worldwide system of restaurants under the brands KFC, Pizza Hut, and Taco Bell.

2.      Yum's business consists of four reporting segments: (i) the China Division; (ii) the India Division; (iii) Yum! Restaurants International ("YRI" or "International Division"); and (iv) the United States Division.  Outside of the U.S. in 2012, the Yum system opened approximately five new restaurants each day of the year.

3.      While the Company has historically seen significant growth in all four segments, in recent years analysts and Yum alike have noted that Yum's future

1

significant growth prospects lie primarily with expanding its presence in China. Before the declines described below, Yum drew more than half of its revenue from China.

4.      As detailed below, Yum's Board of Directors (the "Board") failed to implement appropriate internal controls at Yum's Chinese operations, and this lack of internal controls allowed Yum's management to violate food health and safety standards in China, subjecting the Company to a major decrease in revenues and the potential for significant fines and penalties.   Additionally, the Individual Defendants (as defined below) caused or allowed Yum to issue materially false and misleading statements concerning the Company's financial condition and business prospects, including false financial disclosures in filings with the SEC.

5.      As far back as 2009, Yum's management conducted internal food safety tests on chicken purchased from farmers for consumption in China and found excessive antibiotics in nearly half of the samples tested, in violation of Chinese food health and safety standards.   In 2010, Yum's management pinpointed the farms from which the tainted chickens were purchased, but neither stopped purchasing chickens from this supplier nor reported the findings to Chinese government officials or investors.   Remarkably, the Individual Defendants allowed Yum to continue purchasing chickens from this supplier until at least August 2012.

6.      With the knowledge that:

a) Yum's China Division held the key to long-term growth prospects for the Company;

b) Yum's China Division had purchased significant amounts of tainted chicken from a large farm in mainland China for at least three years; and

c) Disclosure of this practice (and the Company's failure to either disclose or discontinue the practice earlier) could significantly

damage Yum's China Division growth prospects and subject the Company to civil and criminal fines;

the Individual Defendants embarked on a deliberate scheme to mislead investors about Yum's China growth prospects in order to artificially inflate the Company's stock price.

7.     In particular, from approximately October 9, 2012 to the present (the "Relevant Period"), the Individual Defendants made and/or failed to correct materially false and misleading statements concerning the Company's current and future business and financial condition.  Despite recognizing that slowing economic trends generally in China posed risks to Yum's future growth prospects in the country, and despite knowing that disclosure of Yum's illegal practice of knowingly selling tainted chicken in China could potentially ruin prospects for the Company's one primary growth division, the Individual Defendants nevertheless predicted earnings per share ("EPS") growth of at least 13% for the coming fiscal year.

8.     On this news, the share price of Yum's common stock skyrocketed, jumping 7% in a single day on October 10, 2012, from $66.04 to $70.99.  The stock continued to rise dramatically, reaching an all-time high of $74.47 per share on November 29, 2012.

9.     What investors did not know at the time of this massive stock run up, however, was that Chinese media outlets had begun reporting as early as November 23, 2012 that some of Yum's chicken suppliers had been selling chickens to KFC China that were tainted with toxic chemicals.

10.     While this fact remained concealed from investors (at least by Defendants), Yum began revealing the truth about its financial condition on November 29, 2012.  On that day, Defendants caused Yum to revise downward its fiscal year forecast for sales in China.  However, Defendants did not explain that this downward revision was related to (1) Yum's practice of buying and selling

tainted chicken and/or (2) the predicted slowdown in China's economy.  Nor did Yum revise downward its overly optimistic 13% EPS fiscal year Company growth forecast.

11.    On news of this partial disclosure, Yum's stock price sank nearly 9% on heavy trading volume, sliding from $74.47 per share to close at $67.08 per share on November 30, 2012.

12.    Then, on December 20 and 21, 2012, news reports began to surface that Yum had knowingly purchased and sold chickens tainted with excessive hormones, antibiotics, and other toxic chemicals in China for at least three years without disclosing or discontinuing the practice.  On this news, the stock sank further, declining 5% during the two day period from $67.16 per share on December 19, 2012, to $63.88 per share on December 21, 2012.

13.    Following these reports, on January 7, 2013, Defendants caused the Company to again revise downward its full year guidance for 2012 in China, causing another single day 5% decline in Yum's common stock share price. However, the Individual Defendants continued to withhold the full truth about Yum's practices in China, blaming the downward sales revisions not on the Company's purchase and sale of tainted food but on "adverse publicity."

14.    Finally, on February 4, 2013, Defendants caused Yum to issue a statement admitting that the Company's China Division had purchased tainted chicken for sale in its KFC stores, and that the resulting investigations and negative media attention surrounding this practice would adversely affect Yum's previously optimistic forecast for 2013 EPS growth.  Again, Yum's stock declined sharply on this negative news, falling from $65.93 per share to $62.08 per share.

15.    As a result of Defendants' dissemination of false statements, Yum common stock traded at artificially inflated levels during the Relevant Period.

However, as the truth about the tainted Chinese chickens was gradually revealed to investors, the Company's share price plunged.

16.    All told, during the Relevant Period the per share price of Yum's common stock artificially rose 12.7% as a result of Defendants' false and misleading statements before falling 16.6% as the truth was gradually revealed. While outside shareholders were damaged by Defendants' actions, many of the Individual Defendants themselves profited handsomely from the artificial stock inflation, dumping more than $64.6 million of personally held common stock during the Relevant Period.

17.    Plaintiff therefore brings this shareholder derivative action (i) to recover for the Company those losses caused by Defendants' breaches of fiduciary duties, unjust enrichment, insider selling, and aiding and abetting thereof; (ii) to seek reforms to the Company's corporate governance designed to prevent these actions in the future; and (iii) because the Company's Board has refused to take any corrective action despite Plaintiff's demand.

## II.    JURISDICTION AND VENUE

18.    This Court has jurisdiction in this case pursuant to 28 U.S.C. §1332 in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   THE PARTIES

21.     Plaintiff Jennifer Zona is a citizen of Alaska.  She purchased Yum common stock on February 21, 2012, and has continuously held her stock ever since.

22.     Nominal Defendant Yum is incorporated in North Carolina and trades on the New York Stock Exchange under the symbol "YUM."  The Company's China Division is headquartered in Shanghai, China.  The Company's Taco Bell U.S. headquarters are located in Irvine, California.  The Company's International Division is headquartered in Dallas, Texas, and the Company's corporate headquarters are located in Louisville, Kentucky.

23.     Defendant David C. Novak ("Novak"), a citizen of the State of Florida, is and at all relevant times has been, Chairman of the Board and Chief Executive Officer ("CEO") of the Company.

24.     Defendant Jing-Shyh S. Su ("Su"), a citizen of the State of California, is and at all relevant times has been, Vice Chairman of the Board and CEO of Yum! Restaurants China.

25.     Defendant Richard T. Carucci ("Carucci"), a citizen of the State of Kentucky, is and at all relevant times has been, President of the Company.

26.     Defendant Scott O. Bergren ("Bergren"), a citizen of the State of Texas, is and at all relevant times has been, CEO of Pizza Hut U.S. and Yum! Innovation.

27.     Defendant Roger G. Eaton ("Eaton"), a citizen of the State of Oklahoma, is and at all relevant times has been, Chief Operations Officer of the Company.

28.     Defendant Jonathan D. Blum ("Blum"), a citizen of the State of Kentucky, is and at all relevant times has been, Senior Vice President, Chief Public Affairs and Global Nutrition Officer for the Company.

29.     Defendant Anne P. Byerlein ("Byerlein"), a citizen of the State of Kentucky, is and at all relevant times has been, Chief People Officer at the Company.

30.     Defendant Michael J. Cavanagh ("Cavanagh"), a citizen of the State of New York, has served as a director of Yum since 2012.

31.     Defendant David W. Dorman ("Dorman"), a citizen of the State of Florida, has served as a director of Yum since 2005.

32.     Defendant Massimo Ferragamo ("Ferragamo"), a citizen of the State of New York, has served as a director of Yum since 1997.

33.     Defendant Mirian M. Graddick-Weir ("Graddick-Weir"), a citizen of the State of New Jersey, has served as a director of Yum since 2012.

34.     Defendant J. David Grissom ("Grissom"), a citizen of the State of Missouri, has served as a director of Yum since 2003.

35.     Defendant Bonnie G. Hill ("Hill"), a citizen of the State of New York, has served as a director of Yum since 2003.

36.     Defendant Jonathan S. Linen ("Linen"), a citizen of the State of Florida, has served as a director of Yum since 2005.

37.     Defendant Thomas C. Nelson ("Nelson"), a citizen of the State of Maryland, has served as a director of Yum since 1997.

38.     Defendant Thomas M. Ryan ("Ryan"), a citizen of the State of Rhode Island, has served as a director of Yum since 2002.

39.     Defendant Robert D. Walter ("Walter"), a citizen of the State of Florida, has served as a director of Yum since 2008.

40.     The defendants named in ¶¶23-39 are referred to herein as the "Individual Defendants."

41.     Defendants Novak, Su, Cavanagh, Dorman, Ferragamo, Graddick-Weir, Grissom, Hill, Linen, Nelson, Ryan and Walter are all current Board members and are collectively referred to as the "Board" or the "Director Defendants."

42.     Defendants Novak, Su, Ferragamo, Hill, Nelson, Bergren, Eaton, Byerlein and Carucci are sometimes collectively referred to herein as the "Insider Selling Defendants."

## IV.    FACTUAL ALLEGATIONS

### A.    Background

43.     Yum is the world's largest restaurant company as well as one of the largest companies in the world.  It operates throughout the world in four primary business segments that increasingly focus on emerging Asian markets.

44.     Yum's business consists of four reporting segments: (i) the China Division; (ii) the India Division; (iii) YRI; and (iv) the United States Division, which includes Taco Bell U.S., KFC U.S., and Pizza Hut U.S.  The China Division includes only mainland China; YRI includes the remainder of the Company's international operations.   The China Division, with its headquarters based in Shanghai, China, comprises approximately 5,700 system restaurants, including 4,200 KFCs.  The China Division opened 889 new restaurants in China in 2012.

YRI, based in Dallas, Texas, comprises approximately 14,500 system restaurants, primarily franchised KFCs and Pizza Huts, operating in over 120 countries outside the United States.  The KFC U.S. and Yum corporate headquarters, and a research facility in Louisville, Kentucky, are owned by the Company.

      **B.**    **False and Misleading Statements**

    45.    During the Relevant Period, certain defendants made materially false and misleading statements concerning the Company's current and future business and financial condition.  In particular, beginning on October 9, 2012, the Company reported its financial results for its fiscal 2012 third quarter.  In addition to reporting strong sales and EPS growth, including same-store sales growth in China, where the economy was slowing and the Company was predicting low single-digit or flat fourth quarter growth, the Individual Defendants caused the Company to raise its fiscal year EPS growth forecast to at least 13%.  According to Yum's CEO, defendant Novak:

> "Very strong sales and profit at all of our divisions, including China, Yum! Restaurants International, India and the U.S., drove 19% third-quarter EPS growth.  Given the strength of our year-to-date results, I'm pleased to report we are raising our full-year EPS growth forecast to at least 13%, excluding Special Items."

    46.    Following the October 9, 2012 reported financial results and increased fiscal 2012 EPS growth forecast and the Company's October 10, 2012 third quarter conference call, Yum's stock price leaped over 7% from a close of $66.04 per share to $70.99 per share on October 10, 2012.

    47.    Then, on November 23, 2012, reports in the Chinese media disclosed that certain of the Company's chicken suppliers had been feeding chickens sold to KFC China with toxic chemicals.

48.     On November 29, 2012, the Company announced that its October 9, 2012 forecast of single-digit to flat China Division same-store sales would not be met, but instead, the Company expected to report China Division same-store sales of -4%.  The Company nevertheless maintained that it remained on track to deliver at least 13% EPS growth:

> David C. Novak . . .  said, "I'm pleased to report we remain on track to deliver     at least 13% EPS growth this year."
>
> > *     *     *
>
> Same-store sales in the fourth quarter are expected to be +4% at YRI, +3% in the U.S., and -4% in China.

49.     On these disclosures concerning the China Division's same-store sales declines, Yum's stock price declined nearly 9% on massive volume from a close of $74.47 per share on November 29, 2012 to $67.08 per share on November 30, 2012.

50.     On December 20 and 21, 2012, news reports began to circulate that the Company knew well before the Relevant Period that certain chicken suppliers in China had injected chickens with excessive antibiotics and other illegal chemicals but sought to conceal these facts.  In a widely circulated report entitled "Yum Knew in 2010 Chicken Tainted" and published in the Shanghai Daily on December 21, 2012, it was reported that:

> Back in 2010, Yum Brands Inc, the world's largest restaurant company and owner of KFC, found excessive antibiotics in chicken from a supplier but didn't report it and kept on buying the tainted chicken, Shanghai's food safety office said yesterday.
>
> The company and the Shanghai Institute for Food and Drug Control, a government institute paid by the company to test its chicken products, will receive the "strictest punishment" if they are

found to have broken food safety laws, the food safety office said yesterday in an investigation report on the "instant chicken."

Yum Brands Inc signed a contract with SIFDC in August 2005 to serve as a third-party inspection body to test the quality of raw produce from suppliers.

The company sent samples to the institute every two months and paid several million yuan a year for the service, Shanghai Television reported. The food safety office report said that from 2010 to 2011, a total of eight out of 19 batches of chicken the company purchased from the Shandong Liuhe Group were found to have excessive levels of antibiotics.

Liuhe had bought the problem products from several farms where chickens were fed chemicals laced with illegal medicine and 18 kinds of antibiotics to keep them alive and boost their growth, China Central Television reported earlier.

Reports showing that the chicken that contained excessive antibiotics were sent to the company by the institute, but neither the company nor the institute reported the problem to the city government, food safety officials said.

Instead, Yum Brands kept buying chicken products from Liuhe until August this year, the report said. The company said they stopped buying not because of food safety problems but due to "adjustment of strategic layout," according to STV.

"The company should have taken action as soon as it found problems in its raw materials. It should have reported to the city government, tightened management of its supplier or just stopped

purchasing products from it," said Gu Zhenhua, deputy director with the food safety office.

* * *

. . .[A]n STV investigation found KFC was still buying chicken from the company on May 3 this year - more than 30,000 kilograms of chicken wings in 1,000 boxes, according to its purchasing reports. It was not known whether the chicken wings were sold to customers or sealed, STV reported.

51.     As a result of the disclosures on December 20 and 21, 2012, Yum's stock price declined 5% from a close of $67.16 per share on December 19, 2012, to $63.88 per share on December 21, 2012.

52.     On January 7, 2013, the Company filed a Form 8-K with the SEC updating its full year 2012 guidance for same-store sales for its China Division, stating that it was lowering its financial outlook due to publicity surrounding the Chinese government's review of its poultry supply:

Item 2.02 Results of Operations and Financial Condition

Due to adverse publicity associated with a government review of China poultry supply – and the corresponding significant impact on KFC China sales during the last two weeks of December – we now expect China Division same-store sales to be -6% for the fourth quarter of 2012, versus our previous forecast of -4%. The Company expects full-year 2012 earnings per share, excluding Special Items, of approximately $3.24. We do not anticipate providing any further updates or commentary until our scheduled earnings release on February 4, 2013.

53.    As a result of the disclosures on January 7, 2013, Yum shares dropped 5% on January 8, 2013 on high volume, from $67.89 per share to as low as $64.40 per share.

**C.    The Truth is Revealed**

54.    On February 4, 2013, Defendants caused the Company to issue a press release further addressing the Chinese media reports and their effect on Yum's current and future financial prospects.   The release stated in part (all emphasis added):

**CHINA UPDATE**

KFC sales in the last two weeks of the fourth quarter were significantly impacted by the intense media attention surrounding an investigation by the Shanghai FDA (SFDA) into poultry supply management at Yum! China. The investigation was prompted by a report broadcast on China's national television (CCTV), which aired on December 18, 2012. The report showed that a few poultry farmers were ignoring laws and regulations by using excessive levels of antibiotics in chicken. ***Regrettably, some of this product was purchased by two poultry suppliers of KFC China***. The investigation caused further media attention, including social media commentary, and this negatively affected consumer perceptions of poultry safety, and KFC in particular.

On January 25, 2013, the SFDA concluded its investigation and released its recommendations. We appreciate their thorough and diligent review. ***The SFDA identified issues and provided "Supervisory Recommendations" to Yum! China to strengthen our poultry supply chain practices including refined voluntary self***

13

*testing procedures, improved reporting and communications and enhanced supplier management*.

\* \* \*

## 2013 OUTLOOK

We are confident the YRI and U.S. businesses will deliver annual operating profit growth consistent with our ongoing growth model. *Given current uncertainties related to KFC sales in China, it is difficult to confidently forecast our overall financial performance*. We have made the assumption that KFC China same-store sales will improve as the year progresses and will be positive in the fourth quarter. With these assumptions, we estimate a mid-single digit EPS decline in 2013 versus prior year, excluding Special Items. *This includes an expectation for a significant decline in EPS performance in the first half of the year* followed by EPS growth in the second half.

\* \* \*

## DAVID NOVAK COMMENTS

*. . . [A]s a result of adverse publicity from the poultry supply situation in mid-December, China KFC sales experienced a sharp decline. Due to continued negative same-store sales and our assumption that it will take time to recover consumer confidence, we no longer expect to achieve EPS growth in 2013.*

\* \* \*

*January 2013 estimated same-store sales declined 37%, including 41% for KFC and 15% at Pizza Hut Casual Dining*.

55.     The representations by Defendants concerning the Company's current business and financial condition, including its forecasted financial results, were

each materially false and misleading when made, because Defendants failed to disclose the following true facts which were known to Defendants or recklessly disregarded:

(a) Slowing economic trends in China were stronger than reported and could not support forecasted sales results for the Company's China Division nor the Company-wide increased EPS growth;

(b) Defendants knew but concealed that Yum's own food safety inspections had already found that Chinese chicken supplier Shandong Liuhe Group ("Shandong Liuhe") had sold the Company chickens with high levels of antibiotics and other illegal drugs and/or chemicals; and

(c) The Company had continued to buy products from Shandong Liuhe until as late as August 2012.

56.     Rather than disclose these critical facts to investors, Defendants kept silent throughout the Relevant Period while the Company's stock traded at artificially inflated prices.  Moreover, as discussed below, while in possession of this non-public, material, adverse information, nine of the Individual Defendants (Defendants Novak, Su, Ferragamo, Hill, Nelson, Bergren, Eaton, Byerlein and Carucci) dumped millions of dollars in stock just weeks before the truth was revealed.

57.     The Company has continued to report additional declines in sales as a result of the continuing concerns about the safety of its chicken.  On April 23, 2013, the Company reported disappointing results for the first quarter of 2013, including a 36% plunge in same-store sales for KFC in China.

58.     In the press release issued by the Company on April 23, 2013, Defendant Novak reported that:

While better than expected, the first quarter was extremely difficult for Yum! Brands. As anticipated, intense media attention surrounding poultry supply in China significantly impacted KFC sales and profit. ***Earnings per share declined 8% versus prior year, as our China Division operating profit fell 41%.*** Operating profit increased 19% at Yum! Restaurants International and 5% in our U.S. business.

The negative media surrounding poultry supply in China has subsided. We have taken steps to enhance our industry-leading supply chain practices, and we're now in the midst of an aggressive quality assurance marketing campaign. However, our sales recovery has been adversely affected by the recent news of Avian flu. This news surfaced during the first week of April and continues to negatively impact same-store sales. We continue to remind consumers that properly cooked chicken is perfectly safe to eat. Historically, the sales impact of Avian flu publicity has initially been dramatic at KFC but relatively short-lived. We will stay the course with our plans to develop at least 700 new units in China this year to lay the foundation for future growth. We have complete confidence in a full sales recovery.

59.     Despite Defendant Novak's claims that negative media reports have subsided and that sales are expected to recover, recent news stories report continued concerns about Yum's ability to maintain quality control.

60.     As reported by *Fortune* on May 9, 2013, earlier that week Yum "faced another PR disaster when reports suggested Chinese regulators started investigating a mutton supplier possibly tied to the company's hot pot franchise

Little Sheep."   Although Yum was later cleared in that incident, according to Euromonitor's head of consumer foodservice research Michael Schaefer, "Chinese consumers are fed up with quality control issues…. As people become wealthier, as living standards rise, you get this sense of, 'Why can't we have safe food? Why does this keep happening?'" So when consumers felt Yum had a transparency problem, he says, "It wasn't just fear, it was anger."

61.    A *Bloomberg* article on May 12, 2013, described the continued lack of consumer confidence in KFC by Chinese consumers following the misconduct. The article observed that the KFC in a mall in Shanghai had empty tables while the nearby McDonald's was almost full, and quoted a young man explaining that many of his friends and family have stopped eating chicken and visiting KFC.  "People have lost trust and their faith in the brand," he said.

## V.    INSIDER SELLING ALLEGATIONS

62.    During the Relevant Period, and while in possession of material, adverse, non-public information regarding the tainting of Yum's Chinese chicken supply, Defendants Novak, Su, Ferragamo, Hill, Nelson, Bergren, Eaton, Byerlein and Carucci sold an unusually large amount of Yum stock that was not in keeping with their previous stock trading histories.

### A.    Defendant Novak

63.    Defendant Novak, as the Chairman of the Board and CEO of the Company, clearly had detailed information concerning the serious safety issues surrounding Yum's Chinese chicken supply.  During the Relevant Period, neither Defendant Novak nor any other member of Yum bothered to tell investors about this critical, materially adverse change in the Company's prospects for sales in China.  Instead, during this period Defendant Novak sold 540,600 shares of Yum common stock in highly unusual trading for $35,787,720.

64.     Defendant Novak's nearly $36 million stock dump was the result of a single trade effectuated on December 10, 2012.  This trade is highly suspicious and indicative of his deliberate efforts to profit on non-public materially adverse information.  Among the reasons giving rise to suspicion include:

- <u>Timing</u>: Defendant Novak's trade came only ten days before the Shanghai Daily article was published detailing Yum's practices, and less than one month before the Company revised downward guidance for its China Division.

- The trade was not effectuated pursuant to a 10b5-1 trading plan.

- The trade was not the result of an exercise of options that were set to expire imminently.

- Novak received cash, rather than stock, for his trade.

**B.     Defendant Su**

65.     Defendant Su, as the Company's Vice Chairman of the Board and CEO of Yum! Restaurants China, likely was more intimately aware of the issues surrounding Yum's Chinese chicken supply than any other senior officer in the Company.  Nevertheless, during the Relevant Period, neither Defendant Su nor any other member of Yum bothered to tell investors about this critical, materially adverse change in the Company's prospects for sales in China.  Instead, during this period Defendant Su sold 98,950 shares of Yum common stock in highly unusual trading for $6,485,183.

66.     Defendant Su's nearly $6.5 million stock dump was the result of two trades of 49,475 shares each effectuated on December 10, 2012 (the same day as Defendant Novak's $36 million stock dump) and on December 28, 2012.  These trades were effectuated only weeks before Yum revised downward its guidance for the Company's China Division.  Moreover, Su received cash rather than more Yum stock.

## C.    Defendant Carucci

67.    Defendant Carucci, as the President of the Company, clearly had detailed information concerning the serious safety issues surrounding Yum's Chinese chicken supply.  During the Relevant Period, neither Defendant Carucci nor any other member of Yum bothered to tell investors about this critical, materially adverse change in the Company's prospects for sales in China.  Instead, during this period Defendant Carucci sold 54,200 shares of Yum common stock in highly unusual trading for $3,678,012.

68.    Defendant Carucci's stock dump was the result of a single trade effectuated on December 13, 2012.  This trade is highly suspicious and indicative of his deliberate efforts to profit on non-public materially adverse information.  Among the reasons giving rise to suspicion include:

- Trading Patterns: Defendant Carucci had made only one sale of Yum stock in the previous eighteen months, and none in the previous ten months.
- Timing: Defendant Carucci's trade came only seven days before the Shanghai Daily article was published detailing Yum's practices, and less than one month before the Company revised downward guidance for its China Division.
- The trade was not effectuated pursuant to a 10b5-1 trading plan.
- The trade was not the result of an exercise of options that were set to expire imminently.
- Carucci received cash, rather than stock, for his trade.

## D.    Defendant Bergren

69.    Defendant Bergren, as the CEO of Pizza Hut U.S. and Yum! Innovation, clearly had detailed information concerning the serious safety issues surrounding Yum's Chinese chicken supply.  During the Relevant Period, neither

Defendant Bergren nor any other member of Yum bothered to tell investors about this critical, materially adverse change in the Company's prospects for sales in China.  Instead, during this period Defendant Bergren sold 166,596 shares of Yum common stock in highly unusual trading for $12,059,530.

70.     Defendant Bergren's $12 million stock dump was the result of five highly suspicious trades in a short six-week time period between October 11, 2012 and November 26, 2012:

| Date | Shares | Price | Proceeds |
| --- | --- | --- | --- |
| 10/11/12 | 52,126 | $70.14 | $3,655,867 |
| 10/15/12 | 280 | $70.00 | $19,600 |
| 11/2/12 | 27,632 | $73.16 | $2,021,557 |
| 11/6/12 | 24,400 | $73.07 | $1,782,908 |
| 11/26/12 | 62,158 | $73.68 | $4,579,598 |

71.     These trades were all made during the height of Yum's artificial stock inflation, ***beginning two days after Defendants issued their first materially misleading statement and ending three days before the first negative news reports causing Yum's stock price to begin its decline***.

72.     These trades are highly suspicious and indicative of his deliberate efforts to profit on non-public materially adverse information for additional reasons as well, including:

- Percentage of Stock Sold: Defendant Bergren sold ***93.4%*** of his entire Yum stock holdings during this period, or if calculated to include vested stock options and stock appreciation rights, at least 30% of his total holdings.

- Trading Patterns: Defendant Bergren had not sold any Yum stock for two years prior to this stock dump.

- The trades were not the result of an exercise of options that were set to expire imminently.

- Bergren received cash, rather than stock, for his trades.

**E.    Defendant Eaton**

73.    Defendant Eaton, as the Chief Operations Officer of the Company, clearly had detailed information concerning the serious safety issues surrounding Yum's Chinese chicken supply.  During the Relevant Period, neither Defendant Eaton nor any other member of Yum bothered to tell investors about this critical, materially adverse change in the Company's prospects for sales in China.  Instead, during this period Defendant Eaton sold 35,990 shares of Yum common stock in highly unusual trading for $2,567,167.

74.    Defendant Eaton's stock dump was the result of a single trade effectuated on October 17, 2012.  This trade is highly suspicious and indicative of his deliberate efforts to profit on non-public materially adverse information. Among the reasons giving rise to suspicion include:

- Trading Patterns: Defendant Eaton had not sold any Yum stock in the year prior to his October 17, 2012 stock dump.

- Timing: Defendant Eaton's trade came one week after Defendants' misleading statements on October 9, 2012, near the height of the Company's artificial stock inflation.

- The trade was not effectuated pursuant to a 10b5-1 trading plan.

- The trade was not the result of an exercise of options that were set to expire imminently.

- Eaton received cash, rather than stock, for his trade.

**F.    Defendant Byerlein**

75. Defendant Byerlein, as the Chief People Officer of the Company, clearly had detailed information concerning the serious safety issues surrounding Yum's Chinese chicken supply. During the Relevant Period, neither Defendant Byerlein nor any other member of Yum bothered to tell investors about this critical, materially adverse change in the Company's prospects for sales in China. Instead, during this period Defendant Byerlein sold 42,098 shares of Yum common stock in highly unusual trading for $2,793,623.

76. Defendant Byerlein's stock dump was the result of a single trade effectuated on December 10, 2012, the same day as Defendant Novak's $36 million stock dump. This trade is highly suspicious and indicative of her deliberate efforts to profit on non-public materially adverse information. Among the reasons giving rise to suspicion include:

- Trading Patterns: Defendant Byerlein had not sold any Yum stock in the fifteen months prior to her December 10, 2012 stock dump.
- Timing: Defendant Byerlein's trade came only ten days before the Shanghai Daily article was published detailing Yum's practices, and less than one month before the Company revised downward guidance for its China Division.
- The trade was not effectuated pursuant to a 10b5-1 trading plan.
- The trade was not the result of an exercise of options that were set to expire imminently.
- Byerlein received cash, rather than stock, for her trade.

**G.     Defendant Ferragamo**

77. Defendant Ferragamo, as a director of the Company, clearly had detailed information concerning the serious safety issues surrounding Yum's Chinese chicken supply. During the Relevant Period, neither Defendant Ferragamo nor any other member of Yum bothered to tell investors about this

critical, materially adverse change in the Company's prospects for sales in China. Instead, during this period Defendant Ferragamo sold 5,547 shares of Yum common stock in highly unusual trading for $382,302.

78.    Defendant Ferragamo's trades during this period were effectuated on October 11, 2012 (just two days after Defendants issued materially misleading guidance leading to a sharp jump in Yum's stock price) and December 12, 2012 (only eight days before reports surfaced about Yum's China Division practices). These trades were also suspicious because Ferragamo had not made any Yum trades in the previous year, the trades were not made pursuant to a 10b5-1 trading plan, and were not the result of an exercise of options set to expire.    Moreover, Ferragamo received cash rather than stock for his sales.

### H.    Defendant Hill

79.    Defendant Hill, as a director of the Company, clearly had detailed information concerning the serious safety issues surrounding Yum's Chinese chicken supply.  During the Relevant Period, neither Defendant Hill nor any other member of Yum bothered to tell investors about this critical, materially adverse change in the Company's prospects for sales in China.  Instead, during this period Defendant Hill sold 2,070 shares of Yum common stock in highly unusual trading for $137,650.

80.    Defendant Hill's stock dump was the result of a single trade effectuated on December 10, 2012, the same day as Defendant Novak's $36 million stock dump.  This trade is highly suspicious and indicative of her deliberate efforts to profit on non-public materially adverse information.  Among the reasons giving rise to suspicion include:

- Trading Patterns: Defendant Hill had never sold Yum stock prior to her December 10, 2012 stock dump, despite having served as a director since 2003.

- Timing: Defendant Hill's trade came only ten days before the Shanghai Daily article was published detailing Yum's practices, and less than one month before the Company revised downward guidance for its China Division.

- The trade was not effectuated pursuant to a 10b5-1 trading plan.

- The trade was not the result of an exercise of options that were set to expire imminently.

- Hill received cash, rather than stock, for her trade.

**I.      Defendant Nelson**

81.    Defendant Nelson, as a director of the Company, clearly had detailed information concerning the serious safety issues surrounding Yum's Chinese chicken supply.  During the Relevant Period, neither Defendant Nelson nor any other member of Yum bothered to tell investors about this critical, materially adverse change in the Company's prospects for sales in China.  Instead, during this period Defendant Nelson sold 11,206 shares of Yum common stock in highly unusual trading for $759,766.

82.    Defendant Nelson's stock dump was the result of two identical trades effectuated on December 14, 2012.  These trades are highly suspicious and indicative of his deliberate efforts to profit on non-public materially adverse information.  Among the reasons giving rise to suspicion include:

- Trading Patterns: Defendant Nelson had never previously sold Yum common stock, despite having served as a Yum director since 1997.

- Timing: Defendant Nelson's trades came only six days before the Shanghai Daily article was published detailing Yum's practices, and less than one month before the Company revised downward guidance for its China Division.

- The trades were not effectuated pursuant to a 10b5-1 trading plan.

24

- The trades were not the result of an exercise of options that were set to expire imminently.

- Nelson received cash, rather than stock, for his trade.

## VI.   DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.   Fiduciary Duties

83.    By reason of their positions as officers, directors, and/or fiduciaries of Yum and because of their ability to control the business and corporate affairs of Yum, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Yum in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Yum and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

84.    Each director and officer of the Company owes to Yum and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### B.   Control, Access, And Authority

85.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Yum, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Yum.

86.     Because of their advisory, executive, managerial, and directorial positions with Yum, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Yum.

87.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Yum, and was at all times acting within the course and scope of such agency.

## C.      Reasonable And Prudent Supervision

88.     To discharge their duties, the officers and directors of Yum were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Yum were required to, among other things:

(a)      refrain from acting upon material inside corporate information to benefit themselves;

(b)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)      remain informed as to how Yum conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)      ensure that Yum was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## VII.   BREACHES OF DUTIES

89.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Yum and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Yum, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Yum, the absence of good faith on their part, and a reckless disregard for their duties to Yum and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Yum.

90.      The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that the Company's sales outlook in China was positive.  In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of the federal securities laws.  As a result, Yum has expended, and will continue to expend, significant sums of money to rectify Defendants' wrongdoing.

## VIII.  CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

91.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

92.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that Yum's prospects for sales in China were positive.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

93.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

94.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

95.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions

to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IX.   DAMAGES TO YUM

96.   As a result of the Individual Defendants' wrongful conduct, Yum disseminated false and misleading statements.   The improper statements have devastated Yum's credibility.   Additionally, Yum is now the subject of a securities fraud class action lawsuit.   The Company will face substantial costs in connection with an investigation and the lawsuit.

97.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Yum's market capitalization has been substantially damaged.

98.   Further, as a direct and proximate result of the Individual Defendants' conduct, Yum has expended and will continue to expend significant sums of money.   Such expenditures include, but are not limited to:

a.   costs incurred in investigating and defending Yum and certain officers in a class action lawsuit, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

b.   costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Yum artificially-inflated stock price and inflated revenues; and

c.   costs incurred from the loss of the Company's customers' confidence in Yum services.

99.   Moreover, these actions have irreparably damaged Yum's corporate image and goodwill.   For at least the foreseeable future, Yum will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such

that Yum's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## X.   DERIVATIVE AND DEMAND ALLEGATIONS

100.   Plaintiff brings this action derivatively in the right and for the benefit of Yum to redress injuries suffered, and to be suffered, by Yum as a direct result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   Yum is named as a nominal defendant solely in a derivative capacity.

101.   Plaintiff will adequately and fairly represent the interests of Yum in enforcing and prosecuting its rights.

102.   Plaintiff was a shareholder of Yum common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

103.   On February 14, 2013, Plaintiff made a demand (the "Demand") on the Board under N.C. Gen. Stat. § 55-7-42 to investigate and address the misconduct, and, if warranted, to commence litigation against the Individual Defendants.   A true and correct copy of the Demand is attached as Exhibit A.

104.   On March 28, 2013, counsel for the Company replied to the Demand and informed Plaintiff that the Board had formed a Special Litigation Committee ("SLC") to consider the Demand.   A true and correct copy of the March 28, 2013 letter is attached as Exhibit B.

105.   Under North Carolina law, the Board had an affirmative duty to conduct a reasonable, objective, and good faith investigation into the allegations in the Demand, and determine on the basis of that investigation whether pursuing the claims in litigation against the Individual Defendants would be in the Company's best interests and whether the Demand's factual allegations and legal claims have merit.

106. On May 17, 2013, Christian L. Campbell, Yum's Senior Vice President General Counsel and Secretary, sent a response to the Demand to Plaintiff's counsel. The letter stated that the SLC's investigation was ongoing and not yet completed, with an expected completion date of approximately July 31. The letter also stated that in light of the ongoing investigation, Yum "must reject Ms. Zona's demand to the extent that it requests that YUM! institute litigation at this point in time." A true and correct copy of the May 17, 2013 letter is attached as Exhibit C.

107. Over ninety days have passed since Plaintiff made the Demand, and the Board has informed Plaintiff that her Demand is rejected to the extent that the Demand requested that the Board commence legal proceedings. The Board has not provided any further information regarding the SLC or the investigation process, any results of the investigation, or a full and complete explanation justifying the Board's refusal to pursue a civil action against the Company's management for the misconduct.

108. Plaintiff now therefore brings this action to redress injuries suffered, and to be suffered, by Yum as a direct result of breaches of fiduciary duty, unjust enrichment, insider selling, and the aiding and abetting thereof, by the Individual Defendants. Yum is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

## COUNT I

### Against The Individual Defendants For Breach Of Fiduciary Duty

109. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110. Defendants owed and owe Yum fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe Yum the highest obligation

of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

111.   Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

112.   Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

113.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Yum has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

114.   Plaintiff, on behalf of Yum, has no adequate remedy at law.

## COUNT II
### Against Defendants Novak, Su, Ferragamo, Hill, Nelson, Bergren, Eaton, Byerlein And Carucci For Breach Of Fiduciary Duty For Insider Selling And Misappropriation Of Information

115.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.   At the time Defendants Novak, Su, Ferragamo, Hill, Nelson, Bergren, Eaton, Byerlein and Carucci sold their Yum stock, they knew the information described above, and sold Yum stock on the basis of such information.

117.   The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Defendants Novak, Su, Ferragamo, Hill, Nelson, Bergren, Eaton, Byerlein and Carucci used

for their own benefit when they sold hundreds of thousands of shares of Yum common stock for proceeds of $64,650,953.

118.   At the time of their stock sales, Defendants Novak, Su, Ferragamo, Hill, Nelson, Bergren, Eaton, Byerlein and Carucci knew that the Company's stock price was artificially inflated due to the wrongdoing alleged herein.  Their sales of Yum stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

119.   Since the use of the Company's proprietary information for their own gain constitutes a breach of Defendants Novak, Su, Ferragamo, Hill, Nelson, Bergren, Eaton, Byerlein and Carucci's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby.

120.   Plaintiff, on behalf of Yum, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants For Unjust Enrichment**

121.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Yum.

123.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Yum.

124.   Plaintiff, as a shareholder and representative of Yum, seeks restitution from these Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches.

125.   Plaintiff, on behalf of Yum, has no adequate remedy at law.

**XI.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of federal securities laws, breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty, and unjust enrichment;

B.     Directing Yum to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Yum and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a provision to control and limit insider stock selling based on non public information;

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of Yum to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of Yum's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions;

C.      Awarding to Yum restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## XII.  JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 21, 2013                    JENNIFER ZONA, derivatively on behalf of YUM! BRANDS, INC.

/s/ THOMAS R. KERR

Thomas R. Kerr
732 Scott Street
Covington, KY 41011
Telephone: (859) 431-2222
Facsimile: (859) 431-3463

Frank J. Johnson
Shawn E. Fields
Cecilia E. Rutherford
JOHNSON & WEAVER, LLP
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

Attorneys for Plaintiff